ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL (199706)
davidm@rgrdlaw.com
RACHEL L. JENSEN (211456)
rachelj@rgrdlaw.com
655 W. Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
        – and –
STUART A. DAVIDSON
sdavidson@rgrdlaw.com
MARK DEARMAN
mdearman@rgrdlaw.com
ALEX KRUZYK
akruzyk@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JON MCMILLEN, CHRISTINA MCMILLEN, MARK MCMILLEN, RALPH MCMILLEN, WAHAB KHAN, MARC GUSTAFSON and PETER LEVITT, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> VOLKSWAGEN AG, VOLKSWAGEN GROUP OF AMERICA, INC., MARTIN WINTERKORN, MICHAEL HORN, Individually and DOES 1-25, <br><br> Defendants. | Case No. 2:15-cv-07615 <br><br> CLASS ACTION <br><br> CLASS ACTION COMPLAINT <br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Jon and Christina McMillen, Mark McMillen, Ralph McMillen, Wahab Khan, Marc Gustafson, and Peter Levitt ("Plaintiffs"), by and through their attorneys, brings this action on behalf of themselves, and all others similarly situated, against Defendants Volkswagen AG ("VW AG"), Volkswagen Group of America, Inc. ("VW America") (collectively "VW"), Martin Winterkorn ("Winterkorn"), and Michael Horn ("Horn") (collectively, "Defendants" or "Volkswagen").  Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## INTRODUCTION

1.     This nationwide consumer class action arises out of Volkswagen's brazenly fraudulent scheme to increase its market share by rigging smog tests. Specifically, Volkswagen marketed its 2009-2015 diesel vehicles as "green" and "clean," yet they were anything but.  And to avoid detection, Volkswagen deliberately circumvented the Environmental Protection Agency ("EPA") and state regulations through software designed to hide the high amounts of pollution emitted from those vehicles when it detected that the vehicle was undergoing smog tests.

2.     Specifically, to perpetuate its scheme, Volkswagen installed defective diesel engine systems containing a "defect device" in approximately 500,000 vehicles that were sold in the United States (the "Defective Vehicles").  This device was designed specifically to allow the Defective Vehicles to spew pollutants while in normal operation, and to manipulate engine performance when it detects testing to

simulate compliance with emission standards.  However, this compliance was only possible during emissions testing, not in regular use.

3.     Despite advertising its diesel vehicles as being low emission and environmentally-friendly with high fuel economy and exceptional performance, Volkswagen instead intentionally delivered Defective Vehicles that emitted up to 40 times more pollutants than allowed under EPA and California standards.  But to avoid detection, Volkswagen installed the defeat devices and, for years, enjoyed an advantage over its competition by claiming innovations in low-emission technology without sacrificing high fuel efficiency and performance.

4.     Volkswagen's scheme worked – Volkswagen has become the world's top automaker for the first half of 2015, and is now one of the largest sellers of diesel passenger vehicles in the United States.[1]  According to the Volkswagen website, Volkswagen has sold more diesel cars in the United States than every other brand combined.[2]

5.     However, as a result of Volkswagen's fraudulent conduct and misrepresentations, and the installation of the defective engine systems containing illegal defeat devices, the Defective Vehicles emit far more toxic pollutants than

---

[1]   http://www.timesfreepress.com/news/business/aroundregion/story/2015/sep/21/volkswagen-stops-selling-2015-diesel-cars-20-liter-engines/326259/ (last visited on Sept. 28, 2015).

[2]   http://www.vw.com/features/clean-diesel/ (last visited on Sept. 21, 2015).

disclosed by Volkswagen in its warranties and advertisements.  In fact, "putting aside the inevitable fines, possible criminal charges, and massive public disgrace, there are half a million cars running an emissions setup that ***never should've left the factory***."[3]  And indeed, each of these Defective Vehicles is also illegal because Volkswagen did not obtain a valid EPA certificate of conformity for importing them.

6.      Plaintiffs and the Class were induced to purchase or lease illegal Defective Vehicles and are now left with vehicles that violate the Clean Air Act and state law, and do not (and cannot) perform as represented by Volkswagen or as required by law.  Plaintiffs have suffered damages in that they purchased and/or leased Defective Vehicles that they would not have purchased and/or leased had they known they were illegally imported and/or had defective engine systems that contained defeat devices.  Alternatively, Plaintiffs and the Class would not have paid as much for these Defective Vehicles.  Plaintiffs further suffer diminution in value of their Defective Vehicles as the vehicles do not, and cannot, perform as advertised and are likely subject to heightened maintenance requirements.  Although Volkswagen is reportedly initiating a recall of the Defective Vehicles, it will not be able to comply with EPA emission standards without negatively impacting other vehicle specifications, such as

---

[3]     http://www.popularmechanics.com/cars/a17430/ezra-dyer-volkswagen-diesel-controversy/ (last visited on Sept. 28, 2015).

fuel economy and horsepower.  Plaintiffs may suffer from increased fuel costs, and the Defective Vehicles will still not perform as advertised.

7.    Plaintiffs and the Class are consumers who purchased or leased a Defective Vehicle containing a defective Clean Diesel engine system with a defeat device, including but not limited to:

| **Year** | **Make & Model(s)** |
|---|---|
| 2009 | Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI |
| 2010 | Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, and Audi A3 |
| 2011 | Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, and Audi A3 |
| 2012 | Volkswagen Beetle TDI, Volkswagen Beetle Convertible TDI, Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, Audi A3, Volkswagen Passat TDI |
| 2013 | Volkswagen Beetle TDI, Volkswagen Beetle Convertible TDI, Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, Audi A3, Volkswagen Passat TDI |
| 2014 | Volkswagen Beetle TDI, Volkswagen Beetle Convertible TDI, Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, Audi A3, Volkswagen Passat TDI |
| 2015 | Volkswagen Beetle TDI, Volkswagen Beetle Convertible TDI, Volkswagen Golf TDI, Volkswagen Jetta TDI, Volkswagen Jetta SportWagen TDI, Audi A3, Volkswagen Passat TDI, Volkswagen Golf SportWagen TDI |

8.      Plaintiffs, for themselves and all others similarly situated, hereby bring this action under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1961 *et seq.* ("RICO")); for fraud by concealment, breach of express and implied warranties under the Uniform Commercial Code and Magnuson-Moss Warranty Act (15 U.S.C. §2301 *et seq.* ("MMWA")); and under various state consumer protection and product liability statutes.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. §1331, because Plaintiffs' claims arise under the RICO Act, 18 U.S.C. §1962.  The Court has diversity jurisdiction because Plaintiffs and Defendants reside in different states.  The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.  This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiffs and Volkswagen are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5,000,000.00, exclusive of attorneys' fees, interest, and costs; and Class Members reside across the United States.  The citizenship of each party is fully described below.

10.      This Court has personal jurisdiction over Volkswagen because Volkswagen has significant minimum contacts with this State, and intentionally availed themselves of the laws of California by conducting a substantial amount of

business throughout the State of California and this District and because Volkswagen committed the acts and omissions complained of herein, in part, in the State of California and this District.

11.     Venue is proper in this Court under 28 U.S.C. §1391, because: (i) Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; and/or (ii) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia*, Defendants' promotion, marketing, distribution and sale of the Defective Vehicles in this District.  Volkswagen sells a substantial amount of automobiles in this District, has dealerships in this District, operates a major emissions testing facility in this District, and much of the misconduct occurred in this District. Venue is also proper under 18 U.S.C. §1965(a), because Volkswagen is subject to personal jurisdiction in this District, and Defendants have agents located in this District.

## PARTIES

**A.     Plaintiffs**

       **1.     California Plaintiffs**

12.     California Plaintiffs Jon and Christina McMillen ("California Plaintiffs") purchased a 2012 Golf TDI in October, 2014 from Mossy Volkswagen of Escondido, California.

13.     California Plaintiffs chose to purchase this diesel vehicle because it was marketed as environmentally friendly, and they relied on the vehicle specifications regarding emissions, fuel economy and horsepower.

14.     California Plaintiffs were previous owners of Volkswagen vehicles that left them satisfied and trusting of the Volkswagen brand, and believed Volkswagen's assertions about their vehicle's quality to be accurate.  Further, Plaintiffs Jon and Christina McMillen had received glowing recommendations from a friend who also owned a Golf TDI.

15.     California Plaintiffs were also previously satisfied with their prior ownership of Ford and General Motors brand diesel pickup trucks, which offered long engine life, superior fuel economy and excellent engine power.  Consistent with their positive experiences with diesel, California Plaintiffs sought to support Clean Diesel technology as a viable alternative to other gas and hybrid options.

16.     California Plaintiffs relied on the representations of Volkswagen regarding pollution emissions when deciding to purchase this specific vehicle, and, at the time California Plaintiffs purchased their vehicle, they did not have knowledge of the defective engine system containing the defeat device.

17.     California Plaintiffs would not have purchased their vehicle had they been aware that the "defeat devices" had been installed in these Defective Vehicles, and/or that the Defective Vehicles did not comply with the advertised specifications

regarding pollution emissions, fuel economy, and were not as environmentally friendly as represented.

18.     Alternately, California Plaintiffs would have paid substantially less for their vehicle.

19.     California Plaintiffs are now stuck with a Defective Vehicle that is not remotely as environmentally friendly as represented, and contains a defeat device rendering its Clean Diesel engine system defective and allowing up to 40 times more pollution than allowed by law.  To make matters worse, if Volkswagen is able to fix the emissions problem, it will likely do so by sacrificing the fuel economy, horsepower, durability, and performance of California Plaintiffs' Defective Vehicle, which California Plaintiffs deemed absolutely critical in their purchasing decision.

20.     California Plaintiffs feel particularly betrayed by Volkswagen, as they promoted Volkswagen vehicles to their family and friends, many of whom relied on California Plaintiffs' advice and purchased other Defective Vehicles. Instead of supporting diesel as an environmentally friendly automotive technology, California Plaintiffs now reasonably fear that Volkswagen has permanently destroyed consumer confidence in diesel technology and destroyed the potential for this fuel source.

**2.     Colorado Plaintiff**

21.     Colorado Plaintiff Mark McMillen ("Colorado Plaintiff") purchased a 2013 Volkswagen Golf TDI in November, 2012 from Bob Penkhus Volkswagen of Colorado Springs, Colorado.

22.     Colorado Plaintiff chose to purchase a diesel vehicle because it was marketed as environmentally friendly, had a turbo-charged engine capable of handling the rugged terrain in Colorado, and he relied on the vehicle specifications regarding fuel economy, durability, and performance.   Maintaining a small environmental footprint was a critical factor in Colorado Plaintiff's purchase.

23.     Colorado Plaintiff trusted Volkswagen and appreciated the vehicle as an ideal cross between efficiency and performance; so much so that Colorado Plaintiff's wife ordered a 2016 Golf TDI, which has been delayed subsequent to the revelation of Volkswagen's fraud.

24.     When Colorado Plaintiff purchased his vehicle, he believed that the vehicle complied with all specifications disclosed and advertised to him by Volkswagen.

25.     Colorado Plaintiff would not have purchased this vehicle had he been aware that the "defeat devices" had been installed in these Defective Vehicles, and/or that the Defective Vehicles did not comply with the advertised specifications regarding pollution emissions, fuel economy, and were not as environmentally friendly as represented.

26.     Alternatively, Colorado Plaintiff would have paid substantially less for his vehicle.

27.     Colorado Plaintiff is now left with a vehicle that is not remotely as environmentally friendly as represented, and contains a defeat device rendering its

Clean Diesel engine system defective and allowing up to 40 times more pollution than allowed by law.  To make matters worse, if Volkswagen is able to fix the emissions problem, it will likely do so by sacrificing the fuel economy, horsepower and performance of Colorado Plaintiff's vehicle.  Colorado Plaintiff's vehicle will likely have dramatically reduced resale value, as well.

28.     Colorado Plaintiff feels particularly betrayed by Volkswagen, as Colorado Plaintiff promoted Volkswagen vehicles to his family and friends, some of whom relied on Colorado Plaintiff's advice and purchased other Defective Vehicles

### 3.     Illinois Plaintiff

29.     Illinois Plaintiff Wahab Khan ("Illinois Plaintiff") purchased a 2015 Volkswagen Passat TDI in June, 2014 from Bill Jacobs Volkswagen of Naperville, Illinois.

30.     Illinois Plaintiff chose to purchase a diesel vehicle because they were marketed as environmentally friendly, and he relied on the vehicle specifications regarding fuel economy, durability, and performance.

31.     When Illinois Plaintiff purchased his vehicle, he believed that the vehicles complied with all specifications disclosed and advertised to him by Volkswagen.

32.     Illinois Plaintiff would not have purchased this vehicle had he been aware that the "defeat devices" had been installed in these Defective Vehicles, and/or that the Defective Vehicles did not comply with the advertised specifications regarding

pollution emissions, fuel economy, and were not as environmentally friendly as represented.

33.    Alternatively, Illinois Plaintiff would have paid substantially less for his vehicle.

34.    Illinois Plaintiff is now left with a vehicle that is not remotely as environmentally friendly as represented, and contains a defeat device rendering its Clean Diesel engine system defective and allowing up to 40 times more pollution than allowed by law.  To make matters worse, if Volkswagen is able to fix the emissions problem, it will likely do so by sacrificing the fuel economy, horsepower and performance of Illinois Plaintiff's vehicle.

### 4.    New Mexico Plaintiff

35.    New Mexico Plaintiff Ralph McMillen ("New Mexico Plaintiff") purchased a 2014 Volkswagen Jetta SportWagen TDI in November, 2013 at Al Serra Volkswagen of Colorado Springs, Colorado.

36.    New Mexico Plaintiff chose to purchase a diesel vehicle because it was marketed as environmentally friendly, and he relied on the vehicle specifications regarding fuel economy, durability, and performance.

37.    New Mexico Plaintiff was notified at the time of purchase that the vehicle would get great fuel mileage, and that Volkswagen vehicles can sometimes exceed their own listed mpg estimates.

38.     New Mexico Plaintiff trusted Volkswagen and admired the dependability of their vehicles; so much so that the 2014 Volkswagen Jetta SportWagen TDI was his fifth Volkswagen purchase.

39.     When New Mexico Plaintiff purchased his vehicle, he believed that the vehicle complied with all specifications disclosed and advertised to him by Volkswagen.

40.     New Mexico Plaintiff would not have purchased this vehicle had he been aware that the "defeat devices" had been installed in these Defective Vehicles, and/or that the Defective Vehicles did not comply with the advertised specifications regarding pollution emissions, fuel economy, and were not as environmentally friendly as represented.

41.     Alternatively, New Mexico Plaintiff would have paid substantially less for his vehicle.

42.     New Mexico Plaintiff is now left with a vehicle that is not remotely as environmentally friendly as represented, and contains a defeat device rendering its Clean Diesel engine system defective and allowing up to 40 times more pollution than allowed by law.  To make matters worse, if Volkswagen is able to fix the emissions problem, it will likely do so by sacrificing the fuel economy, horsepower and performance of New Mexico Plaintiff's vehicle.

### 5.    North Carolina Plaintiff

43.    North Carolina Plaintiff Marc Gustafson ("Plaintiff Gustafson" or "North Carolina Plaintiff") leased a 2012 Jetta TDI in January, 2012 from Frema Motors in Goldsboro, North Carolina for three years.  North Carolina Plaintiff subsequently purchased the vehicle after the lease expired in January, 2015.

44.    North Carolina Plaintiff chose to purchase his Defective Vehicle primarily due to the purported reduced environmental impact of the diesel engine and the higher resale value of diesel vehicles due to their slower depreciation.

45.    North Carolina Plaintiff relied on the representations of Volkswagen regarding pollution emissions when deciding to purchase these specific vehicles, and, at the time North Carolina Plaintiff purchased his vehicle, he did not have knowledge of the defective engine system containing the defeat device.

46.    When North Carolina Plaintiff purchased his vehicle, he believed that the vehicle complied with all specifications disclosed and advertised to him by Volkswagen.

47.    North Carolina Plaintiff would not have purchased this vehicle had he been aware that the "defeat devices" had been installed in these Defective Vehicles, and/or that the Defective Vehicles did not comply with the advertised specifications regarding pollution emissions, fuel economy, and were not as environmentally friendly as represented.

48.    Alternatively, North Carolina Plaintiff would have paid substantially less for his vehicle.

49.    North Carolina Plaintiff is now left with a vehicle that is not remotely as environmentally friendly as represented, and contains a defeat device rendering its Clean Diesel engine system defective and allowing up to 40 times more pollution than allowed by law.  To make matters worse, if Volkswagen is able to fix the emissions problem, it will likely do so by sacrificing the fuel economy, horsepower and performance of Plaintiff Gustafson's vehicle.

**6.    Pennsylvania Plaintiff**

50.    Plaintiff Peter Levitt ("Plaintiff Levitt" or "Pennsylvania Plaintiff") purchased a 2013 Volkswagen Passat TDI in November, 2012, and a 2011 Volkswagen Jetta in August, 2011 at Fred Beans Volkswagen in Devon, Pennsylvania.

51.    Pennsylvania Plaintiff chose to purchase these diesel vehicles because they were marketed as environmentally friendly, and he relied on the vehicles' specifications regarding emissions, fuel economy and horsepower.

52.    Prior to purchasing the Defective Vehicles, Pennsylvania Plaintiff owned a Toyota Prius which he bought because it was environmentally friendly and had excellent fuel-economy.  After seven years, Pennsylvania Plaintiff wanted to purchase another environmentally friendly car with great fuel economy and saw Volkswagen's advertisements regarding its "Clean Diesel" technology, and decided to purchase a

1    2011 Jetta TDI in reliance of the representations that the vehicle was environmentally

2    friendly.

3

4          53.    After owning the Jetta for several years, Pennsylvania Plaintiff purchased

5    a 2013 Volkswagen Passat TDI in November of 2012 relying on Volkswagen's

6    representations regarding its Clean Diesel technology, fuel economy, and eco-friendly

7

8    cars.

9          54.    Pennsylvania Plaintiff relied on the representations of Volkswagen

10   regarding pollution emissions when deciding to purchase these specific vehicles, and,

11

12   at the time Pennsylvania Plaintiff purchased his vehicles, he did not have knowledge

13   of the defective engine system containing the defeat device.

14

15         55.    When Pennsylvania Plaintiff purchased his vehicles, he believed that the

16   vehicles complied with all specifications disclosed and advertised to him by

17   Volkswagen.

18

19         56.    Pennsylvania Plaintiff would not have purchased these vehicles had he

20   been aware that the "defeat devices" had been installed in these Defective Vehicles,

21   and/or that the Defective Vehicles did not comply with the advertised specifications

22

23   regarding pollution emissions, fuel economy, and were not as environmentally

24   friendly as represented.

25         57.    Alternatively, Pennsylvania Plaintiff would have paid substantially less

26   for his vehicle.

27

28

58.     Pennsylvania Plaintiff is now left with two vehicles that are not remotely as environmentally friendly as represented, and contain a defeat device rendering its Clean Diesel engine system defective and allowing up to 40 times more pollution than allowed by law.  To make matters worse, if Volkswagen is able to fix the emissions problem, it will likely do so by sacrificing the fuel economy, horsepower and performance of Pennsylvania Plaintiff's vehicles.

**B.     Defendants**

59.     Defendant Volkswagen AG ("VW AG") is a German corporation and the parent company of VW America. VW AG's headquarters and principal place of business are located in Wolfsburg, Germany.  Volkswagen conducts substantial business in the United States and in this District, including its control of VW America; its development and procuring manufacturing plants, including in Chattanooga, Tennessee; its network of dealerships; and its distribution for sale of hundreds of thousands of Defective Vehicles across the United States and in this District.

60.     Defendant Volkswagen Group of America, Inc. ("VW America") is a corporation doing business in all 50 states (and the District of Columbia), and is organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171.

61.     VW America operates a test center located in this District at 201 Del Norte Blvd. in Oxnard, California, which holds Volkswagen's largest emissions compliance laboratory and vehicle test center outside of Germany.  Upon information

and belief, Volkswagen's testing and implementation of their defeat devices and fraudulent scheme were carried out, at least in part, by and through the test center here in Oxnard, California.[4]

62.     At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased, and warranted the Defective Vehicles under the Volkswagen and Audi brand names throughout the United States.  Volkswagen and/or its agents designed, manufactured, and installed the engine systems in the Defective Vehicles, which included the defeat device.  Volkswagen also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Defective Vehicles.

63.     Defendant Martin Winterkorn ("Winterkorn") is a resident of Germany. Winterkorn was CEO of VW AG until he resigned on September 23, 2015, in the wake of the diesel emissions scandal.  Notably, Winterkorn was widely regarded as a

---

[4]    When first opened, the test center was touted as the location where Volkswagen would "conduct research and development for improving reliability, reducing emissions, *and meeting federal standards for Volkswagen's dalliance in clean diesels*, hybrids, and even fuel cell vehicles." *See* http://www.automotive.com/news/we-tour-volkswagens-27-million-research-development-center-in-oxnard-california-108001/ (last visited on Sept. 28, 2015). Further, "VW's top brass also expect to use the facility as a *lead site for integrating engine development — with its tough emissions requirements —* into the rest of the production process." *See* http://www.pacbiztimes.com/2012/08/20/vw-unveils-27m-testing-facility-in-oxnard/ (last visited on Sept. 28, 2015). Finally, automotive expert Ken Ambrose stated, when asked if the test center will perform diesel testing, stated that "*VW will continue to make advancement in diesel technology and the TCC will be at the forefront.*  I confirmed that product planners are looking into diesel options on future models, beyond the vehicles that are currently fitted with TDI® Clean Diesel engines." *See* http://kenambroseblog.com/engineers-at-new-test-center-california-begin-work/ (last visited on Sept. 28, 2015).

detail-oriented, micromanaging CEO, who "retained control over engineering details that many other CEOs would relinquish fully to deputies."[5]  Winterkorn is reportedly being investigated by the German government for allegations of fraud.[6]  Winterkorn has availed himself of the laws of the United States through his management and control over VW America and the manufacture and distribution of hundreds of thousands of Defective Vehicles imported and sold across the United States and in this District.

64.     Defendant Michael Horn ("Horn") is a resident of Virginia.  Horn is President and CEO of VW America.  VW AG reorganized VW America's activities on September 25, 2015, reportedly putting Prof. Dr. Winfried Vahlan in charge of Volkswagen's activities in North America, while allowing Horn to keep his job, despite media reports that he was being ousted in the wake of the scandal.[7]

65.     Defendant Does 1-25 are other persons or entities involved in the design, manufacture, sale, distribution and marketing of the Defective Vehicles.

---

[5]   http://www.usatoday.com/story/money/cars/2015/09/23/volkswagen-emissions-scandal-martin-winterkorn/72673028/ (last visited on Sept. 28, 2015).

[6]   http://www.reuters.com/article/2015/09/28/us-volkswagen-emissions-idUSKCN0RP14U20150928 (last visited on Sept. 28, 2015).

[7]   https://media.vw.com/release/1074/ (last visited on Sept. 25, 2015).

1

**COMMON FACTUAL ALLEGATIONS**

2

**A.     The Scheme Is Hatched for VW's Diesel Engines**

3       66.     Many may view diesel engines as a relic of the past, where vehicles

4

would emit thick, toxic smoke full of dangerous and destructive pollutants.  However,

5

6       diesel technology has reportedly improved so significantly that it is now viewed as a

7       "green" alternative to the standard gasoline automobile, oftentimes grouped with

8

electric and hydrogen cell vehicles.[8]

9

10      67.     Diesel vehicles use diesel fuel instead of standard gasoline, and ignite the

11      fuel through a combination of high temperatures and high compression within the

12

engine, as opposed to a spark ignition in the typical automobile engine.  Diesel fuel is

13

14      traditionally much denser than gasoline, and the high density fuel mixed with higher

15      operating temperatures tends to produce a more efficient vehicle; gasoline engines are

16

typically 30% efficient at converting fuel into energy, while diesel engines can

17

18      convert well over 45% of fuel energy into useful mechanical energy.[9]

19      68.     Diesel engines exist in a state of balance between rich and lean states.  A

20      diesel engine in a rich state contains more fuel than air, which tends to produce higher

21

22      amounts of pollutant soot and reduced fuel efficiency.  On the other hand, the lean

23

24

25      [8]   http://www.fool.com/investing/general/2015/02/22/clean-diesel-hydrogen-fuel-

26      cell-or-electric-volksw.aspx (last visited on Sept. 28, 2015).

27      [9]   http://www1.eere.energy.gov/vehiclesandfuels/pdfs/basics/jtb_diesel_engine.pdf

(last visited on Sept. 28, 2015).

28

state contains more air than fuel and produces higher amounts of $NO_X$.[10]  Neither of these discharges are desirable, as soot is rich in hazardous hydrocarbons and dangerous to lungs, while $NO_X$ has a particularly destructive effect on the ozone layer.

69.    In order for the EPA to designate a diesel automobile as a "clean" vehicle, it must produce both low soot, and low $NO_X$.  Since achieving that is a difficult feat, significant engineering and innovation is required to achieve a clean rating.  Typically, this involves running the diesel engine in a highly compressed, lean state to maximize fuel efficiency, countering soot production with diesel particulate filters, and controlling the $NO_X$ by either using $NO_X$ traps or injecting a special urea fluid to reduce $NO_X$ emissions.   Volkswagen claimed to have achieved this engineering feat to the satisfaction of the EPA, while wrapping it in a fun, affordable, high performance package that seemed to offer the best of all worlds for consumers.

**B.    Volkswagen's Dirty "Clean Diesel" Advertising Campaign**

70.    Much of Volkswagen's success in the diesel market has been tied to its advertisement of its vehicles as eco-conscious vehicles.  In fact, Volkswagen itself refers to the Defective Vehicles as "clean diesel vehicles" and was engaging in broad campaigns to "get clean-diesel power the recognition it deserves as a true "green" technology."[11]

---

[10]  $NO_X$ is a generic term for nitrous oxides.  They are produced from the reaction of nitrogen and oxygen gases in the air during combustion.

[11]  http://media.vw.com/release/617 (last visited on Sept. 28, 2015).

71.     Volkswagen wanted to drive home this "clean" and environmentally friendly concept so much so that they included the term "Clean Diesel" in the name of the Defective Vehicles.

72.     Volkswagen was on a mission to change the way consumers thought of diesel and remove the mental image of sulfur emissions amid clouds of thick soot and instead tout the heightened efficiency and reduced $CO_2$ emissions.  In fact, the Volkswagen website states: "This ain't your daddy's diesel.  Stinky, smoky, and sluggish.  Those old diesel realities no longer apply.  Enter TDI Clean Diesel.  Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency.  We've ushered in a new era of diesel."[12]

73.     Through a national advertising campaign, Volkswagen touted that "Clean diesel delivers more torque, lower fuel consumption and reduces $CO_2$ emissions compared with equivalent gasoline engines."[13]   In fact, this advertising even culminated in a Guinness World Record attempt, winning the award for "lowest fuel consumption – 48 U.S. states for a non-hybrid car" while driving a 2013 Volkswagen Passat TDI.[14]

---

[12]  https://www.vw.com/content/vwcom/es/features/clean-diesel.html  (last visited Sept. 21, 2015).

[13]  http://www.volkswagengroupamerica.com/clean_diesel_tdi.html (last visited on Sept. 21, 2015).

[14]  http://www.autotrader.com/car-news/volkswagen-passat-tdi-sets-world-record-for-fuel-economy-210689 (last visited on Sept. 28, 2015).

74. The following are examples of Volkswagen's advertising campaign



**This ain't your daddy's diesel.**

Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI Clean Diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel.

- Engineered to burn low-sulfur diesel fuel
- "Common Rail" direct injection system

View key fuel efficiency info

## With reduced emissions.

These are not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler. Clean diesel vehicles meet some of the strictest standards in the world. Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle.[1]

▶ Watch and learn about TDI® Clean Diesel



75.     While secretly engaging in fraudulent conduct, evading regulators, and concealing from the public that the Defective Vehicles emitted up to 40 times the amount of pollution allowed under applicable law (or that was detected in smog testing), Volkswagen stated: "The Volkswagen Group is a leader in clean diesel technology" and "[w]ith the introduction of the new EA288 engine, we are excited that our family of TDI Clean Diesel vehicles is continuing to improve and will be even more clean, fuel efficient and powerful."[15]

---

[15]   http://media.vw.com/release/495 (last visited on Sept. 28, 2015).

76.     One advertisement for the Audi A3 depicts Kermit the Frog saying "it's not that easy being green," where celebrity Joel McHale responds "[i]t is now" while referring to the Audi A3.[16]

77.     This advertising proved successful, as Volkswagen took a commanding lead in U.S. diesel sales and was even profiled in many environmental websites and blogs as a preferred vehicle choice, relying on Volkswagen's representations of high mileage and low diesel emissions.[17]  In fact, many of the Defective Vehicles were deemed eligible for federal income tax credits to spur the sale of "clean diesel" technology, and at least $78 million was earmarked for the first run of diesel Jetta buyers in 2009 and 2010.[18]

78.     However, while touting that it was committed to making eco-conscious vehicles and referring to its diesel vehicles as "Clean Diesel," Volkswagen concealed that the engine system contained a defect that intentionally allowed the Defective Vehicles to emit much more pollution than allowed by law or disclosed to the public.

79.     In fact, even after the truth about Volkswagen's Clean Diesel cars has been revealed, Volkswagen had the audacity to maintain their webpage which states

---

[16]  https://adsoftheworld.com/media/tv/audi_67th_primetime_emmy_awards_kermit _gets_set_up (last visited on Sept. 28, 2015).

[17]  *See, e.g.*, http://www.mnn.com/green-tech/transportation/blogs/clean-diesel-what-you-need-to-know; http://www.greencarreports.com/news/1090957_2015-vw-golf-beetle-passat-jetta-all-get-new-clean-diesel-engine (last visited on Sept. 28, 2015).

[18]  https://finance.yahoo.com/news/volkswagen-shares-plunge-most-six-071319964.html (last visited on Sept. 28, 2015).

that, among other things, "Our commitment to making vehicles that are eco-conscious is part of bigger thinking."[19]

### C.  The EPA Discovers Volkswagen's Fraudulent Conduct

80.    The EPA administers a certification program to ensure that every vehicle introduced into United States commerce satisfies applicable emissions standards, and issues certificates of conformity to vehicles that satisfy the emission standards for certain pollutants.

81.    In order to obtain a certificate of conformity and thereby be allowed to introduce a vehicle into United States commerce, a vehicle manufacturer, such as Volkswagen, must submit an application to the EPA that includes a list of all auxiliary emission control devices installed on the vehicles, a justification for each, and a rationale for why the control device is not a defeat device.

82.    A defeat device is defined as an auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation."  40 C.F.R. §86.1803-01.  Motor vehicles that contain such defeat devices cannot be certified.

83.    Volkswagen, however, installed defective Clean Diesel engine systems containing a defeat device in the Defective Vehicles, but did not disclose the presence of the defective engine system or defeat device to the EPA or to the consuming public,

---

[19]  https://www.vw.com/content/vwcom/es/features/clean-diesel.html (last visited on Sept. 21, 2015).

and instead, intentionally and fraudulently misrepresented the amount of emissions released by the Defective Vehicles in normal vehicle operation.   This enabled Volkswagen to circumvent EPA regulation, fraudulently pass EPA tests, and then, after detecting that the test was over, the engine would return to primary driving mode and its grossly excessive $NO_X$ emissions.

84.    The certificates of conformity issued by the EPA for the Defective Vehicles state: "this certificate covers only those new motor vehicles or vehicle engines which conform, in all material respects, to the design specifications" described in the application for the certificate of conformity.

85.    Thus, because the defective engine systems and defeat devices were not disclosed in Volkswagen's application to the EPA or to the consuming public, the Defective Vehicles are not covered by a valid certificate of conformity and are not legally permitted to be introduced into U.S. commerce.  Volkswagen hid this fact from the EPA, from other government agencies, and from consumers, and have continued to sell and/or lease the Defective Vehicles to the public.

86.    On September 18, 2015, the EPA issued a Notice of Violation (the "Violation Notice") stating that Volkswagen violated §203(a)(3)(B) of the Clean Air Act, 42 U.S.C. §7522(a)(3)(B) (the "CAA"), by manufacturing and installing "defeat devices" in certain model year 2009-2015 diesel light engine vehicles that bypass, defeat or render inoperative elements of the vehicles' emission control systems.

87.    The Violation Notice noted that Congress' purpose in enacting the CAA was, *inter alia*, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare."[20]  More specifically, "[t]he CAA and the regulations promulgated thereunder aim to protect human health and the environment by reducing emissions of nitrogen oxides (NOx) and other pollutants from mobile sources of air pollution."[21]  The Violation Notice concluded that, in addition to violating the CAA, the Defective Vehicles also failed to conform to the vehicle specifications described by Volkswagen.

88.    In an attempt to circumvent these laws, and gain profits from the sale and/or lease of the Vehicles, Volkswagen manufactured and installed the Defective Vehicles with defeat devices in the control module of the vehicles that sensed when the vehicles were being tested for compliance with EPA emission standards.  During EPA emissions testing for the Defective Vehicles' certificates of compliance, the device sensed that it was being tested by tracking the parameters of the federal test procedure used for EPA emission testing, and fraudulently produced compliant emission results.

---

[20]  http://www3.epa.gov/otaq/cert/documents/vw-nov-caa-09-18-15.pdf (last visited on Sept. 28, 2015).

[21]  *Id.*

89.     To the detriment of the environment and the consuming public, these emission results were not accurate for normal vehicle operation, and the vehicles are "running an emissions setup that never should've left the factory."[22]

### D.     Volkswagen Concealed the Defective Engine System and Defeat Device from the Public for Years

90.     In May 2014, approximately 5 years after the first model year containing the defective engine system (and defeat device) was introduced by Volkswagen, the West Virginia University's Center for Alternative Fuels, Engines & Emissions published results of a study commissioned by the International Council on Clean Transportation, which found that certain of the Defective Vehicles' real world nitrogen oxide and other pollutant emissions exceeded the allowable EPA emission standards.

91.     This study initially alerted the EPA and the California Air Resources Board ("CARB") to Volkswagen's emissions problems.

92.     However, despite its knowledge that the Defective Vehicles contained defective engine systems (and defeat devices intentionally designed to comply with emission standards while under EPA testing but not under normal driving conditions), Volkswagen failed to disclose this fact to the EPA or the consuming public.

---

[22]     http://www.popularmechanics.com/cars/a17430/ezra-dyer-volkswagen-diesel-controversy/ (last visited on Sept. 28, 2015).

93.     Instead, Volkswagen continued to withhold this information and asserted that the increased emissions could be attributed to various technical issues and unexpected in-use conditions.

94.     In December 2014, Volkswagen issued a recall to update emission control software, and CARB (along with the EPA) conducted follow up testing of the Defective Vehicles both in the laboratory and in during normal road operation.  CARB attempted to pinpoint the exact technical nature of the Defective Vehicles' poor performances and determine why the vehicles' on-board diagnostic system was not detecting the increased emissions.  None of the potential technical issues suggested by Volkswagen adequately explained the higher test results confirmed by CARB.

95.     While offering fabricated solutions, Volkswagen continued to remain silent regarding its knowledge of the true source of the emission discrepancies: Volkswagen's defective engine systems and defeat devices.

96.     In fact, German newspapers are reporting that Volkswagen's knowledge of the emission discrepancies can be traced back for many years.  It has been reported that Volkswagen was first alerted to the defeat device altering emissions as early as 2007, when Bosch (a company that supplies electronics to the automotive industry) wrote a letter to Volkswagen warning them not to use the defeat device during regular operation.  Additionally, in 2011, a Volkswagen whistleblower alerted Volkswagen

about "illegal practices in connection with emissions levels."[23]  Volkswagen chose to suppress and/or ignore these repeated warnings, and continued to deceive the EPA, CARB, and its customers.

97.   It was only when CARB and the EPA threatened to withhold certificates of conformity for Volkswagen's 2016 model year vehicles until Volkswagen explained the anomaly regarding the higher emissions, that Volkswagen finally came clean.

98.   Only in the face of these regulatory ultimatums did Volkswagen admit that it had designed and installed defective engine systems that allowed the Defective Vehicles to operate out of compliance with emission regulations in normal operation, but contained a device which detected when a vehicle was undergoing emissions testing and only operated in compliance with emission standards during such testing.

99.   The defective engine system and defeat device hidden from the EPA and consumers was designed by Volkswagen for the express purpose of tracking the parameters of the federal test procedure and causing emission control systems to underperform when the device determined that the vehicle was not undergoing an emissions test procedure.

---

[23]  http://www.latimes.com/business/la-fi-volkswagen-warned-20150927-story.html (last visited on Sept. 28, 2015).

100.   Volkswagen has now admitted that each of the Defective Vehicles contains an illegal defeat device and do not conform to the specifications provided by Volkswagen.  The engine systems are defective and do not operate in accordance with federal and state law, and do not operate as represented by Volkswagen.

101.   The EPA investigation is ongoing and may lead to a finding of additional violations and Defective Vehicles.

**E.     Fallout from the Revelation of Volkswagen's Fraudulent Scheme**

102.   Immediately after the revelation of Volkswagen's fraud, Volkswagen attempted to scrub their clean diesel advertisements from the internet, as those advertisements served to highlight Volkswagen's fraud, such as holding white towels to Defective Vehicle exhaust pipes to highlight the lack of "dirty" emissions.[24]

103.   In a carefully crafted public statement issued after the fraud was revealed, VW AG CEO Martin Winterkorn did not accept responsibility, but instead stated that he was "deeply sorry that we have broken the trust of our customers and the public."[25] Later, amidst global scrutiny, on September 23, 2015, VW AG CEO Martin Winterkorn announced his resignation from VW AG.[26]

---

[24]  http://jalopnik.com/why-did-volkswagen-delete-all-of-its-diesel-ads-from-yo-1731691453 (last visited on Sept. 28, 2015).

[25]  http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/statement_ceo_of_volkswagen_ag.html (last visited on Sept. 28, 2015).

[26]  http://www.nytimes.com/2015/09/24/business/international/volkswagen-chief-martin-winterkorn-resigns-amid-emissions-scandal.html?_r=0 (last visited on Sept. 28, 2015).

104.   Soon after CEO Winterkorn's public statement, Volkswagen's U.S. chief, Michael Horn, added: "Let's be clear about this: Our company was dishonest with the EPA and the California Air Resources Board and with all of you. In my German words, we have totally screwed up."[27]

105.   According to media reports, the U.S. Department of Justice has launched a criminal investigation into Volkswagen over the emissions cheating scandal.[28]   The German government is also reportedly investigating Winterkorn for fraud.[29]

106.   Volkswagen has released a stop-sale order instructing dealers to immediately stop selling the Defective Vehicles.[30]

107.   Further, the scale and brazenness of the fraud prompted Volkswagen to set aside a 6.5 billion Euro fund to address affected consumers and the EPA.[31]

108.   To remedy Volkswagen's violations, Volkswagen likely will need to recall the Defective Vehicles and configure them to settings that produce a clean level of soot and $NO_X$.   In reconfiguring to this new setting, the efficiency, power, and

---

[27]   http://www.washingtonpost.com/business/economy/vw-emissions-cheating-affects-11-million-cars-worldwide/2015/09/22/30f59bca-6126-11e5-9757-e49273f05f65_story.html?fhakfjksajflkajs (last visited on Sept. 28, 2015).

[28]   http://www.wsj.com/articles/u-s-justice-department-conducts-criminal-probe-of-volkswagen-sources-say-1442869059 (last visited on Sept. 28, 2015).

[29]   http://www.reuters.com/article/2015/09/28/us-volkswagen-emissions-idUSKCN0RP14U20150928 (last visited on Sept. 28, 2015).

[30]   http://www.detroitnews.com/story/business/autos/foreign/2015/09/19/vw-us-dealers-halt-sales-diesel-cars/72488232/ (last visited on Sept. 28, 2015).

[31]   http://www.bloomberg.com/news/articles/2015-09-22/volkswagen-ceo-s-history-of-sweating-the-details-now-haunts-him (last visited on Sept. 28, 2015).

performance of the Defective Vehicles will decline dramatically.  Further, there will be serious degradation of vehicle durability, as these vehicles are designed to operate under particular settings. Certain parameters such as exhaust gas temperature, oil life, or engine/turbocharger RPMs will change and result in decreased durability as Volkswagen attempts to undo the effects of their fraud.

109.   As speculated by Karl Brauer, senior analyst for Kelley Blue Book: "It's really unknown, but I think there'll be an extended period of reduced value for [used Volkswagen vehicles].  The resolution will probably not leave as big of an impression and won't counteract the initial impression that [consumers] are getting with these diesel cars."[32]

110.   Unfortunately for affected consumers, one of the fundamental problems with the Defective Vehicles is that they promised high performance, environmentally friendly operation, and efficient fuel usage in a fun-to-drive vehicle.  Plaintiffs and the Class were induced to buy or lease the Defective Vehicles based on these claims, and paid a premium for a diesel vehicle that had all of these traits.  That car may exist, but it was not the car Plaintiffs and the Class were defrauded into purchasing or leasing.

---

[32] http://www.cnbc.com/2015/09/24/as-volkswagen-loses-other-automakers-could-benefit.html (last visited on Sept. 28, 2015).

## CLASS ACTION ALLEGATIONS

111.   Plaintiffs bring this action as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the Classes and Subclasses listed below.

### F.   The Nationwide Class

112.   All persons or entities in the United States who are current or former owners/lessees of a "Defective Vehicle."  Defective Vehicles include: 2010-2015 Audi A3; 2012-2015 Volkswagen Beetle TDI and Volkswagen Beetle Convertible TDI; 2010-2015 Volkswagen Golf TDI; 2015 Volkswagen Golf SportWagen TDI; 2009-2015 Volkswagen Jetta TDI; 2009-2015 Volkswagen Jetta SportWagen TDI; and 2012-2015 Volkswagen Passat TDI.  The Nationwide Class claims include Plaintiffs' RICO claim and California state law claims alleged herein because the misconduct emanated, in part, from this state by and through the testing center in Oxnard.

### G.   The California Subclass

113.   All persons or entities in the state of California who are current or former owners/lessees of a "Defective Vehicle."  Defective Vehicles include: 2010-2015 Audi A3; 2012-2015 Volkswagen Beetle TDI and Volkswagen Beetle Convertible TDI; 2010-2015 Volkswagen Golf TDI; 2015 Volkswagen Golf SportWagen TDI; 2009-2015 Volkswagen Jetta TDI; 2009-2015 Volkswagen Jetta SportWagen TDI; and 2012-2015 Volkswagen Passat TDI.

### H.  The Colorado Subclass

114.  All persons or entities in the state of Colorado who are current or former owners/lessees of a "Defective Vehicle."  Defective Vehicles include: 2010-2015 Audi A3; 2012-2015 Volkswagen Beetle TDI and Volkswagen Beetle Convertible TDI; 2010-2015 Volkswagen Golf TDI; 2015 Volkswagen Golf SportWagen TDI; 2009-2015 Volkswagen Jetta TDI; 2009-2015 Volkswagen Jetta SportWagen TDI; and 2012-2015 Volkswagen Passat TDI.

### I.  The Illinois Subclass

115.  All persons or entities in the state of Illinois who are current or former owners/lessees of a "Defective Vehicle."  Defective Vehicles include: 2010-2015 Audi A3; 2012-2015 Volkswagen Beetle TDI and Volkswagen Beetle Convertible TDI; 2010-2015 Volkswagen Golf TDI; 2015 Volkswagen Golf SportWagen TDI; 2009-2015 Volkswagen Jetta TDI; 2009-2015 Volkswagen Jetta SportWagen TDI; and 2012-2015 Volkswagen Passat TDI.

### J.  The New Mexico Subclass

116.  All persons or entities in the state of New Mexico who are current or former owners/lessees of a "Defective Vehicle."  Defective Vehicles include: 2010-2015 Audi A3; 2012-2015 Volkswagen Beetle TDI and Volkswagen Beetle Convertible TDI; 2010-2015 Volkswagen Golf TDI; 2015 Volkswagen Golf SportWagen TDI; 2009-2015 Volkswagen Jetta TDI; 2009-2015 Volkswagen Jetta SportWagen TDI; and 2012-2015 Volkswagen Passat TDI.

**K.    The North Carolina Subclass**

117.   All persons or entities in the state of North Carolina who are current or former owners/lessees of a "Defective Vehicle."  Defective Vehicles include: 2010-2015 Audi A3; 2012-2015 Volkswagen Beetle TDI and Volkswagen Beetle Convertible TDI; 2010-2015 Volkswagen Golf TDI; 2015 Volkswagen Golf SportWagen TDI; 2009-2015 Volkswagen Jetta TDI; 2009-2015 Volkswagen Jetta SportWagen TDI; and 2012-2015 Volkswagen Passat TDI.

**L.    The Pennsylvania Subclass**

118.   All persons or entities in the state of Pennsylvania who are current or former owners/lessees of a "Defective Vehicle."  Defective Vehicles include: 2010-2015 Audi A3; 2012-2015 Volkswagen Beetle TDI and Volkswagen Beetle Convertible TDI; 2010-2015 Volkswagen Golf TDI; 2015 Volkswagen Golf SportWagen TDI; 2009-2015 Volkswagen Jetta TDI; 2009-2015 Volkswagen Jetta SportWagen TDI; and 2012-2015 Volkswagen Passat TDI.

119.   Specifically excluded from the proposed Class are individuals who have personal injury claims resulting from the Defective Vehicles, Volkswagen, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, and joint ventures, or entities controlled by Volkswagen, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Volkswagen and/or its officers and/or directors, or any of them; any judge assigned to this action, and any member of their immediate family.  Subject to

additional information obtained through further investigation and discovery, the foregoing Class definition may be expanded or narrowed by amendment or amended complaint.  Plaintiffs expressly reserve the right to move for class certification of different state Classes and Subclasses.

120.  **Numerosity of the Class**.  The members of the Class are so numerous that their individual joinder is impracticable.   Upon information and belief, Volkswagen sold approximately 500,000 Defective Vehicles.  Plaintiffs are informed and believe that there are thousands of members in the Class.  Inasmuch as the Class members may be identified through business records regularly maintained by Volkswagen and its employees and agents, and through the media, the number and identities of Class members can be ascertained.  Members of the Class can be notified of the pending action by e-mail and mail and supplemented by published notice, if necessary.

121.  **Existence and Predominance of Common Question of Fact and Law**. There are questions of law and fact common to the Class.   These questions predominate over any questions affecting only individual Class Members.   These common legal and factual issues include, but are not limited to:

       a.  whether Volkswagen engaged in the conduct alleged herein;

       b.  whether the Defective Vehicles contain a defective engine system that does not comply with EPA emission standards;

c. whether the Defective Vehicles emit more pollution than represented by Volkswagen;

d. whether the Defective Vehicles emit more pollution than allowed under applicable state and federal law;

e. whether the Defective Vehicles can be made to comply with EPA emission standards without sacrificing fuel efficiency or performance;

f. whether the Defective Vehicles can be made to comply with representations made by Volkswagen;

g. whether Volkswagen's representations regarding the Defective Vehicles were materially misleading;

h. whether Volkswagen knew of the defective engine system and defeat device in the Defective Vehicles, and if so, how long has Volkswagen had this knowledge;

i. whether Volkswagen intentionally designed, manufactured, and installed defective engine systems in the Defective Vehicles;

j. whether Plaintiffs and other Class Members overpaid for the Defective Vehicles;

k. whether Volkswagen's conduct violates the laws as set forth in the causes of action;

l.   whether Volkswagen's inevitable remedial measures reduce the utility, value, or performance of their Defective Vehicles;

m.  whether Plaintiffs and Class Members are entitled to equitable or injunctive relief; and

n.   whether Plaintiffs and Class Members are entitled to restitution or damages, and what is the proper measure of these damages.

122.   **Typicality**.  The claims of the representative Plaintiffs are typical of the claims of each member of the Class.  Plaintiffs, like all other Class Members, have sustained damages arising from Volkswagen's violations of the laws, as alleged herein.  The representative Plaintiffs and Class Members were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Volkswagen.

123.   **Adequacy**.   The representative Plaintiffs will fairly and adequately represent and protect the interests of the Class members and have retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation.   There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate.  Counsel for the Class will vigorously assert the claims of all Class Members.

124.   **Predominance and Superiority**.  This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and

fact common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by individual Class Members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Volkswagen's conduct.  Further, it would be virtually impossible for Class Members to individually redress effectively the wrongs done to them.  Even if Class Members themselves could afford such individual litigation, the court system could not.  In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

125.   Plaintiffs contemplate the eventual issuance of a notice to the proposed Class Members setting forth the subject and nature of the instant action.  Upon information and belief, Volkswagen's own business records and electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiffs would contemplate the use of additional media and/or mailings.

126.   Additionally, this action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

    a.  without class certification and determination of declaratory, injunctive, statutory, and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

        i.  inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

        ii.  adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other Class Members not parties to the adjudication or substantially impair or impede their ability to protect their interests;

    b.  the parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole; or

    c.  common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual

members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

    i.    the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

    ii.    the extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

    iii.    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    iv.    the difficulties likely to be encountered in the management of a class action.

## TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

127.    Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence that Volkswagen was concealing and misrepresenting the Defective Vehicles' emission specifications and that the Defective Vehicles contained a defeat device rendering the Clean Diesel engine system defective in violation of federal and state laws, within the time period of any applicable statutes of limitation.

128.   Plaintiffs and the other Class Members did not know, and could not reasonably discover, that Volkswagen intentionally failed to report information within its knowledge to federal and state authorities, or consumers.

129.   Likewise, a reasonable and diligent investigation could not have disclosed that Volkswagen intentionally engaged in emissions deception and that it concealed that information, which was discovered by Plaintiffs shortly before this action was filed.

130.   For years, Volkswagen concealed the defeat device contained in the Defective Vehicles and maintained that the increased emissions from these vehicles could be attributed to various technical issues and unexpected in-use conditions.

131.   Only on or about September 3, 2015, when the EPA and CARB stated that they would not approve Volkswagen's 2016 model year diesel vehicles until Volkswagen could adequately explain the anomalous emissions, did Volkswagen admit that Defective Vehicles contained defective clean diesel engine systems.  The allegations in this Complaint became known only in the wake of this announcement.

132.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

**B.     Fraudulent Concealment Tolling**

133.   Throughout the time period relevant to this action, Volkswagen concealed from Plaintiffs and the other Class Members the defects described herein.

Thus, all applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

134.   Instead of disclosing its emissions scheme, or that the Clean Diesel engine systems contained in the cars were defective and resulted in emissions from the Defective Vehicles that were far worse than represented and violated federal and state law, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

135.   Volkswagen intentionally designed and installed the defeat device to conceal the true amount of pollutants emitted by the Defective Vehicles, and withheld this information for many years.  Only when the EPA and CARB withheld approval of Volkswagen's 2016 model year diesel vehicles until Volkswagen could adequately explain the anomalous emissions, did Volkswagen admit that Defective Vehicles contained defective clean diesel engine systems that emitted far more pollutants than permitted under EPA standards and disclosed to the public.

136.   Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class Members have incurred by virtue of the fraudulent concealment doctrine.

1

**C.**     **Estoppel**

2

3
137.   Volkswagen was under a continuous duty to disclose to Plaintiffs and the

4
other Class Members the true character, quality, and nature of the Defective Vehicles,

5
including facts that it knew about the Defective Vehicles' clean diesel engine systems

6
and pollutant emissions and the Defective Vehicles' failure to comply with federal and

7
state law.

8

9
138.   Volkswagen was under a continuous duty to disclose to Plaintiffs and the

10
other Class Members the true character, quality, and nature of emissions from the

11
vehicles at issue, and of those vehicles' emissions systems, and of the compliance of

12

13
those systems with applicable federal and state law.

14
139.   Volkswagen knowingly, affirmatively, and actively concealed the true

15
nature, quality, and character of the clean diesel engine systems, the emissions control

16

17
systems, and the emissions of the Defective Vehicles.

18
140.   Although Volkswagen had the duty to disclose to Plaintiffs and Class

19
Members that it had engaged in the deception described herein and installed defective

20

21
clean diesel engine systems in the Defective Vehicles, Volkswagen chose to evade

22
federal and state emissions standards and intentionally misrepresented its lack of

23

24
compliance with federal and state law.

25
141.   Thus, Volkswagen is estopped from relying on any statutes of limitations

26
in defense of this action.

27

28

1
2
3
4
5
6

# CAUSES OF ACTION

## COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
#### (18 U.S.C. §§1962(c)-(d))
#### (On Behalf of All Plaintiffs and the Nationwide Class Against Defendants VW AG, Winterkorn, and Horn)

7       142.   Plaintiffs incorporate all allegations made herein.

8
9       143.   This Count is against defendants VW AG, Winterkorn, and Horn.

10
11      144.   This claim arises under 18 U.S.C. §§1962(c) and (d), which provides in relevant part:

12
13      (c)     It shall be unlawful for any person employed by or associated with

14      any enterprise engaged in, or the activities of which affect, interstate or

15      foreign commerce, to conduct or participate, directly or indirectly, in the

16
17      conduct of such enterprise's affairs through a pattern of racketeering

18      activity . . . .

19      (d)     It shall be unlawful for any person to conspire to violate any of the

20
21      provisions of subsection . . . (c) of this section.

22      145.   Volkswagen is the largest auto maker in the world by sales, and conducts

23      its business – legitimate and illegitimate – through various affiliates and subsidiaries,

24
25      each of which is a separate legal entity.  At all relevant times, defendants VW AG,

26      Winterkorn, and Horn were "person[s]," as defined in 18 U.S.C. §1961(3), because

27      they were "capable of holding a legal or beneficial interest in property."

28

146.   In an effort to expand its global reach, market share, and standardization of vehicle marketing and sales in the United States, VW AG formed VW America, a New Jersey company headquartered in Virginia.   VW AG has hiring and firing authority over the executive officers of VW America, as well as oversight of VW America's operations, and tight control over the design, manufacture, and testing of the Defective Vehicles.  At all times, VW America acted for or on behalf of VW AG in undertaking the acts and/or omissions alleged herein.

147.   VW America constitutes a RICO "enterprise" within the meaning of 18 U.S.C. §1961(4), through which VW AG and the other Defendants conducted the pattern of racketeering activity, described herein.  VW AG directed VW America to engage in fraudulent activities that affected interstate commerce, including the design, manufacture, testing, sale and distribution of the Defective Vehicles to consumers all over the country.   VW AG used VW America to manufacture and import the Defective Vehicles into the United States with the defeat device, and VW America operated the largest emissions testing center in this District – in Oxnard, California. VW America's separate legal status also facilitated the unlawful scheme and provided a legal shield from liability for VW AG.

148.  Alternatively, defendants VW AG, Winterkorn, Horn, and other individuals and entities, including third parties, operated an association-in-fact enterprise, which was formed for the purpose of manufacturing, selling and distributing the Defective Vehicles, and through which they conducted a pattern of

racketeering activity, under 18 U.S.C. §1961(4). The enterprises alleged in this and the previous paragraph are referred to collectively as the "Defective Vehicle Enterprise."

149. Defendants are employed by, and/or associated with, the Defective Vehicle Enterprise.

150. Each participant in the Defective Vehicle Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Defective Vehicle Enterprise, Defendants and others engaged in consensual decision-making, and functioned as a continuing unit for the common purpose of exacting revenues.

151. Defendants participated in the operation and management of the Defective Vehicle Enterprise by directing its affairs, as described herein. While Defendants participated in, and are members of, the Defective Vehicle Enterprise, they have a separate existence from the Enterprise, including distinct offices, bank accounts, officers, directors, employees, and financial statements.

152. The Defective Vehicle Enterprise was created and/or used as a tool to carry out the elements of Defendants' illicit scheme and pattern of racketeering activity. The Defective Vehicle Enterprise has set structures and purposes beyond the scope and commission of Defendants' predicate acts and conspiracy to commit such acts, and is separate and distinct from VW AG and the individual Defendants.

153. Defendants and the other members of the Defective Vehicle Enterprise all had the common purpose to maximize revenues and increase their market share by falsely advertising and selling the Defective Vehicles as "clean" diesel vehicles with superior fuel efficiency and performance, which they knew or recklessly disregarded as defective and designed illegally to circumvent laws in this country.

154. The Defective Vehicle Enterprise engaged in, and its activities affected, interstate and foreign commerce by designing, manufacturing, marketing, and selling the Defective Vehicles to hundreds of thousands of persons in the United States.

155. Defendants exerted substantial control over the Defective Vehicle Enterprise, and participated in the conduct of the Enterprise's affairs by:

(a)    knowingly designing the Defective Vehicles with cheat software and failing to correct or disable the defeat device when warned;

(b)    knowingly manufacturing and importing Defective Vehicles that emitted greater pollution than the legal limit;

(c)    importing the Defective Vehicles without a valid EPA certificate of conformity because the applications for such certificates were fraudulent;

(d)    persisting in the manufacturing, distribution, and sale of the Defective Vehicles even after questions were raised about the emissions testing and/or once the rigging of the emissions testing became known;

(e)    designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

(f)     otherwise misrepresenting or concealing the defective nature of the Defective Vehicles from the public and regulators; and/or

(g)     collecting revenues and profits from the sale of such products.

156.   At all relevant times, Defendants knew of the ongoing scheme, were willing participants in it, and made money from it.

157.   Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because all such information lies in Defendants' and others' hands.

158.   Defendants have committed, or aided and abetted, the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343), within the past ten years.  The multiple acts of racketeering activity which they did, or conspired to, or aided or abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Defective Vehicle Enterprise.

159.   Defendants' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

(a)     Mail Fraud:  Defendants violated 18 U.S.C. §1341, by sending or receiving, or causing to be sent or received, materials via U.S. mail or commercial

interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Defective Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

(b)    Wire Fraud:  Defendants violated 18 U.S.C. §1343, by transmitting and receiving, or causing to be transmitted or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

160.    Defendants used, or directed the use of, thousands of interstate mail and wire communications to create, operate and manage the scheme through virtually uniform misrepresentations, concealments and material omissions.   Defendants' fraudulent use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of:

(a)    the Defective Vehicles themselves;

(b)    code and other integral components for the cheat software;

(c)    falsified emissions tests;

(d)    fraudulent applications for EPA certificates of conformity;

(e)    documents and communications that facilitated the falsified emissions tests;

(f)    false or misleading communications intended to lull the public and regulators from discovering the cheat software;

(g)     sales and marketing materials, including advertising, websites, product packaging, and labeling, which misrepresented and concealed the true nature of the Defective Vehicles;

(h)     documents intended to facilitate the manufacture and importation of the Defective Vehicles, including bills of lading, shipping records, reports and correspondence;

(i)     documents to process and receive payment for the Defective Vehicles by unsuspecting consumers, including invoices and receipts;

(j)     deposits of proceeds; and

(k)     other documents and things, including electronic communications.

161.    Based on information and belief, VW AG or VW America personnel, for the purpose of executing the above-described scheme, caused to be delivered, or received, shipments of the Defective Vehicles and related documents by mail or a private interstate carrier affecting interstate commerce as well as interstate wire communications and payments, including the advertisements alleged above and transactions alleged below:

| **From** | **To** | **Date** | **Description** |
| --- | --- | --- | --- |
| Mossy Volkswagen | Jon and Christina McMillen | October, 2014 | Documents related to sale of 2012 Golf TDI to California Plaintiffs |
| Bob Penkhus Volkswagen | Mark McMillen | November, 2012 | Documents related to sale of 2013 Golf TDI to Colorado Plaintiff |
| Bill Jacobs | Wahab Khan | June, 2014 | Documents related to sale of 2015 Passat TDI |

| From | To | Date | Description |
|---|---|---|---|
| Volkswagen | | | to Illinois Plaintiff |
| Al Serra Volkswagen | Ralph McMillen | November, 2013 | Documents related to sale of 2014 Jetta SportWagen TDI to New Mexico Plaintiff |
| Frema Motors | Marc Gustafson | January, 2012 | Documents related to lease of 2012 Jetta TDI to North Carolina Plaintiff |
| VW Credit | Marc Gustafson | January, 2015 | Documents related to sale of 2012 Jetta TDI to North Carolina Plaintiff |
| Fred Beans Volkswagen | Peter Levitt | November, 2012 | Documents related to sale of 2013 Passat TDI to Pennsylvania Plaintiff |
| Fred Beans Volkswagen | Peter Levitt | August, 2011 | Documents related to sale of 2011 Jetta TDI to Pennsylvania Plaintiff |

162.   Volkswagen also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.   Specifically, VW America, under the direction and control of VW AG, made representations about the Defective Vehicles on its website, YouTube, and through ads and reviews online, all of which were intended to mislead the public about the fuel-efficiency, emissions standards, and other performance metrics.

163.   Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

164.   The mail and wire transmissions described herein were made in furtherance of Defendants' scheme to deceive consumers and lure them into purchasing Defective Vehicles, which Volkswagen knew or recklessly disregarded as emitting greater pollution than advertised.  These acts of mail and wire fraud were not committed in isolation; rather, they were related and posed a threat of continued fraudulent activity, and therefore constitute a pattern of racketeering activity.

165.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud would have occurred.  They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

166.   Defendants and other members of the Defective Vehicle Enterprise have obtained money and property belonging to Plaintiffs and the Class as a result of these violations.  Plaintiffs and other Class Members have been injured in their business or property by Defendants' overt acts of mail and/or wire fraud, and by their aiding and abetting others' acts of mail and wire fraud.

167.   Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c), as described herein.

Various other persons, firms and corporations, including entities not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy.

168. Defendants aided and abetted others in the violations of the above laws, thereby rendering it indictable as a principal in the 18 U.S.C. §§1341 and 1343 offenses.

169. Defendants engaged in a conspiracy to: (a) increase or maintain revenues; (b) increase market share; and (c) minimize losses of revenues or profits for Defendants and their co-conspirators.

170. To achieve these goals, Defendants hid from the general public the unlawfulness and emissions dangers of the Defective Vehicles and obfuscated the true nature of the defect even after it had knowledge of the potential hazards and dangers associated with those Vehicles. Defendants suppressed and/or ignored warnings from manufacturers and internal whistleblowers of both the unlawfulness of the defeat device and of the defects present in the Defective Vehicles.

171. Defendants and each member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, and selling the Defective Vehicles.

172. Plaintiffs and the Class have been injured in their property by the violations of 18 U.S.C. §§1962(c) and 1962(d), including the loss of value of their

vehicles, greater fuel costs, and other related expenses.  In the absence of the unlawful scheme, Plaintiffs and the Class would not have incurred these economic losses.

173.   Plaintiffs' and the Class' injuries were directly and proximately caused by Defendants' racketeering activities.

174.   Defendants knew and intended that Plaintiffs and the Class would rely on the misrepresentations and omissions about the emissions standards for the vehicles. Defendants knew and intended that consumers would incur costs as a result.  As fully alleged herein, Plaintiffs, along with thousands of other consumers, did place such reliance upon Defendants' representations and omissions.

175.   Because of this deceptive scheme and conspiracy, Plaintiffs and the Class purchased a vehicle that is now next to worthless.  But for the scheme, Plaintiffs and the Class would not have purchased the vehicles.  Therefore, the damages suffered by Plaintiffs and the Class may be measured by the amount paid for the vehicles, totaling many millions of dollars, if not billions, even without trebling their damages.

176.   Under 18 U.S.C. §1964(c), Plaintiffs are entitled to recover treble their actual damages plus interest, the costs of bringing this suit, and reasonable attorneys' fees.

### COUNT II
### FRAUD BY CONCEALMENT
### (On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)

177.   Plaintiffs incorporate all allegations made herein.

178.   This claim is brought pursuant to the law of California or alternatively, Virginia (location of VW America's headquarters), on behalf of a Nationwide Class. In the alternative, Plaintiffs will plead sub-classes, based on residency, to allege fraudulent concealment under the laws of other states.

179.   Volkswagen intentionally concealed and suppressed material facts concerning the quality and character of the Defective Vehicles.  As alleged herein, Volkswagen engaged in deception to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions.

180.   The software installed on the vehicles at issue was designed to only activate during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road.  The result was that the Defective Vehicles improperly passed emissions certifications by way of deliberately induced false readings.

181.   Plaintiffs and Class Members reasonably relied upon Volkswagen's false representations.  They had no way of knowing that Volkswagen's representations were false and misleading.  As alleged herein, Volkswagen employed extremely sophisticated methods of deception.  Plaintiffs and Class Members did not, and could not, discover Volkswagen's deception on their own.

182.   Volkswagen's false representations were material to consumers because they concerned the quality of the Defective Vehicles, including their compliance with

applicable federal and state laws and regulations regarding clean air and emissions, and also because of the price premium charged for the Defective Vehicles.

183.   Volkswagen had a duty to disclose the emissions deception in which it engaged with respect to the Defective Vehicles because knowledge of the deception and its details were known and/or accessible only to Volkswagen.   Likewise, Volkswagen knew the facts were unknown to or not reasonably discoverable by Plaintiffs or Class Members.

184.   In addition, Volkswagen had a duty to disclose because it made affirmative misrepresentations and/or material omissions about the qualities of its vehicles with respect to emissions standards.  These include, but are not limited to, references that they are clean diesel cars which were misleading, deceptive, and incomplete without the disclosure of the deception.

185.   Having volunteered to provide information to Plaintiffs and the Class, Volkswagen had the duty to disclose the entire truth.  These omitted and concealed facts were material because they directly affect the legality, value, and performance of the Defective Vehicles purchased or leased by Plaintiffs and Class Members.

186.   Volkswagen actively concealed and/or suppressed these material facts to increase its profits and market share and to avoid the perception that its Defective Vehicles did not or could not comply with federal and state laws governing clean air and emissions.  Such a perception would have been detrimental to the Volkswagen brand.

187.  Plaintiffs and Class Members were unaware of the omitted material facts referenced herein, and they would not have purchased or leased the Defective Vehicles if they had known of the concealed and/or suppressed material facts.

188.  Based on the concealment of the facts, Plaintiffs and Class Members have sustained damages because they were induced to purchase the illegal Defective Vehicles, they now own or lease vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions, and Volkswagen's failure to timely disclose the true facts about hundreds of thousands of Volkswagen- and Audi-branded vehicles.

189.  Accordingly, Volkswagen is liable to Plaintiffs and Class Members for damages in an amount to be determined at trial.  Volkswagen's acts were done wantonly, maliciously, and deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' needs and warrants an assessment of punitive damages, also in an amount to be determined.

## COUNT III

### BREACH OF STATE EXPRESS WARRANTIES

**(On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)**

190.  Plaintiffs incorporate all allegations made herein.

191.  Volkswagen's actions, as alleged above, violate state express warranty statutes in the states of California (Cal. Com. Code §2313), Colorado (Colo. Rev. Stat. §4-2-313), Illinois (810 Ill. Comp. Stat. 5/2-313), New Mexico (N.M. Stat. Ann. §55-

2-313), North Carolina (N.C. Gen. Stat. §25-2-313), and Pennsylvania (13 Pa. Cons. Stat. §2313).  This count is thus brought collectively on behalf of the California, Colorado, Illinois, New Mexico, North Carolina, and Pennsylvania Subclasses, as well as other members of the Nationwide Class who are residents in other states as appropriate, in which the statutes outlining the cause of action for a breach of express warranty are substantially the same.

192.   Volkswagen marketed, sold and distributed the Defective Vehicles to Plaintiffs and the members of the respective state Subclasses in the regular course of its business.

193.   Volkswagen expressly represented and warranted, by and through statements, descriptions, and affirmations of fact made by it and its authorized agents and representatives that the Defective Vehicles were environmentally friendly and produced legal levels of emissions, all while maintaining excellent gas mileage and high quality performance. These representations were materially false.

194.   Further, Volkswagen issued a written warranty to Plaintiffs and the members of the Subclasses in which Volkswagen warranted that the Defective Vehicles were free from defects in material and workmanship.

195.   In reliance upon these express warranties, Plaintiffs and the members of the Subclasses purchased or leased the Defective Vehicles.

196.   The Defective Vehicles failed to comply with the express warranties because they suffered from inherent defects that, from the date of purchase forward,

rendered the Defective Vehicles unfit for their intended use and purpose and left them with significant defects in material and workmanship.

197.   Volkswagen knew or had reason to know that the Defective Vehicles did not conform to the express representations because the vehicles were neither as efficient, environmentally friendly, usable, nor free from defects as represented.

198.   Plaintiffs notified Volkswagen of the breach within a reasonable time and/or was not required to do so because affording Volkswagen a reasonable opportunity to cure its breach of written warranty would have been futile. Volkswagen was also on notice of the defects from government investigation, research reports, and prior correspondence with the EPA and CARB.

199.   As a direct and proximate cause of Volkswagen's breach, Plaintiffs and the other Subclass members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease.  Additionally, Plaintiffs and the Class either have incurred or will incur economic damages at the point of repair in the form of the cost of repair, cost of increased fuel consumption, and cost of increased maintenance.

200.   Plaintiffs and the Class Members are entitled to legal and equitable relief against Volkswagen, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

**COUNT IV**

**BREACH OF STATE IMPLIED WARRANTIES**

**(On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)**

201.    Plaintiffs incorporate all allegations made herein.

202.    Volkswagen's actions, as alleged above, violate implied warranty of merchantability statutes in the states of California (Cal. Civ. Code §1792), Colorado (Colo. Rev. Stat. §4-2-314), Illinois (810 Ill. Comp. Stat. 5/2-314), New Mexico (N.M. Stat. Ann. §55-2-314), North Carolina (N.C. Gen. Stat. §25-2-314), and Pennsylvania (13 Pa. Cons. Stat. §2314).  This count is thus brought collectively on behalf of the California, Colorado, Illinois, New Mexico, North Carolina, and Pennsylvania Subclasses, as well as other members of the Nationwide Class who are residents in other states as appropriate, in which the statutes outlining the cause of action for a breach of implied warranty are substantially similar.

203.    Volkswagen marketed, sold and distributed the Defective Vehicles to Plaintiffs and the members of the respective state Subclasses in the regular course of its business.

204.    Volkswagen impliedly warranted, by and through statements, descriptions, and affirmations of fact made by it and its authorized agents and representatives that the Defective Vehicles were of merchantable quality, would pass without objection in the trade or business under the contract description, and were free of material defects and fit for the ordinary purposes for which they were to be used.

205.    In reliance upon these implied warranties, Plaintiffs and the members of the Subclasses purchased or leased the Defective Vehicles.

206.   The Defective Vehicles failed to comply with the implied warranties because they suffered from inherent design defects that, from the date of purchase forward, rendered the Defective Vehicles unfit for their intended use and purpose and made them not free from defects in material and workmanship.  Specifically, the Defective Vehicles were equipped with defective Clean Diesel engine systems.

207.   Volkswagen knew that the vehicles did not conform to the implied warranties because the vehicles were neither usable nor free from defects as represented.

208.   Plaintiffs notified Volkswagen of the breach within a reasonable time and/or was not required to do so because affording Volkswagen a reasonable opportunity to cure its breach of written warranty would have been futile. Volkswagen was also on notice of the defects from government investigation, research reports, and prior correspondence with the EPA and CARB.

209.   Plaintiffs and Class Members have had sufficient direct dealings with either Volkswagen or their agents (via dealerships) to establish privity of contract between Plaintiffs and the Class Members.  Notwithstanding this, privity is not required in this case because Plaintiffs and Class Members are intended third-party beneficiaries of contracts between Volkswagen and its dealers; specifically, they are the intended beneficiaries of Volkswagen's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty

agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs' and the Class Members' Defective Vehicles are considered dangerous instrumentalities.

210. As a direct and proximate cause of Volkswagen's breach, Plaintiffs and the other Class Members have suffered damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs and the other Class Members either have incurred or will incur economic damages at the point of repair in the form of the cost of repair, increased future fuel costs, and increased future maintenance costs.

211. Plaintiffs and the other Class Members are entitled to legal and equitable relief against Volkswagen, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

**COUNT V**

**BREACH OF CONTRACT**

**(On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)**

212. Plaintiffs incorporate all allegations made herein.

213. This claim for common law breach of contract is brought by all Plaintiffs on behalf of the Nationwide Class.

214. The conduct alleged herein, where Volkswagen surreptitiously installed defeat devices in their Defective Vehicles in order to fraudulently pass EPA emissions tests, constitutes a significant and material breach of contract. The Defective Vehicles

would not achieve the performance benchmarks represented by Volkswagen without using the defeat device to fraudulently pass the EPA emissions tests.

215.   Had Volkswagen not deceived Plaintiffs and the EPA, Plaintiffs would not have purchased or leased the Defective Vehicles, or would not have purchased the Defective Vehicles at the premium prices that Volkswagen charged.

216.   Volkswagen's sale of these Defective Vehicles constitutes a contract between Volkswagen and the purchaser or lessee, and these contracts were breached by Volkswagen's brazen deception and decision to circumvent EPA regulations, thus inducing purchase or the lease, and leaving Plaintiffs with Defective Vehicles that were of greatly diminished value and/or performance, and/or increased costs.

217.   As a direct and proximate result of Volkswagen's breach of contract, Plaintiffs and the other Class Members are entitled to legal and equitable relief against Volkswagen, including but not limited to, damages, incidental and consequential damages, attorneys' fees, costs of suit, and other relief as appropriate.

**COUNT VI**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**

**(15 U.S.C. §2301, *et seq*.)**

**(On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)**

218.   Plaintiffs incorporate all allegations made herein.

219.   The Defective Vehicles are "consumer product[s]" as defined in 15 U.S.C. §2301(1).

220.   Plaintiffs and the Class are "consumer[s]" as defined in 15 U.S.C. §2301(3).

221.   Volkswagen is a "supplier" and "warrantor" as defined in 15 U.S.C. §2301(4)-(5).

222.   Volkswagen provided Plaintiffs and the Class with numerous written warranties as described in 15 U.S.C. §2301(6).

223.   Volkswagen made implied warranties arising under state law regarding the Defective Vehicles within the meaning of 15 U.S.C. §2301(7).

224.   Volkswagen's warranties pertained to consumer products costing more than $25.

225.   Volkswagen provided Plaintiffs and the Class who purchased a new Defective Vehicle with a written Manufacturer's Warranty, which provides "bumper-to-bumper" limited express warranty coverage for the lesser of 3 years or 36,000 miles.  This warranty includes coverage of emission-related repairs.

226.   Additionally, Volkswagen provided a Federal Emissions Warranty to members of the Class, which covers all emissions related parts for the lesser of 2 years or 24,000 miles, as well as an emissions warranty for the catalytic converter, engine control unit, and onboard diagnostic device for the lesser of 8 years or 80,000 miles.

227.   Further, Volkswagen provided a California Emissions Warranty to members of the California Subclass, which provided greater warranties than those required by federal law.  Specifically, the California Emissions Warranty covers all

emissions-elated performance and parts for the lesser of 3 years or 50,000 miles, and a vehicle-specific list of more expensive emissions-related parts for the lesser of 7 years or 70,000 miles.  The California Emissions Warranty provisions described here cover vehicles up to 14,000 pounds GVWR (Gross Vehicle Weight Rating), and are applicable to the Defective Vehicles.

228.   Volkswagen breached these warranties by selling Defective Vehicles containing defeat devices for the specific purpose of circumventing EPA emissions regulation, while surreptitiously emitting up to 40 times the legal limit of hazardous $NO_X$.

229.   In order to restrict emissions to the legal limit and deactivate the defeat device, the Defective Vehicles will need to be repaired, thus lowering the performance and/or efficiency of the Defective Vehicles.  Thus, Volkswagen's breach of these warranties has deprived Plaintiffs and other Class Members of the benefit of their bargain.

230.   The amount in controversy of each of Plaintiffs' individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy for the Class meets or exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

231.   Volkswagen could have disclosed information regarding the inability for the Defective Vehicles to perform as warranted or attempted to cure its breach of

warranties, but Volkswagen chose not to do so and instead chose to conceal these critical facts from Plaintiffs and the Class.

232.    As a direct and proximate result of Volkswagen's conduct, Plaintiffs have lost money or property by purchasing the Defective Vehicles they otherwise would not have, or paying a premium they otherwise would not have, and the Defective Vehicles have suffered a diminution in value. Plaintiffs and  the Class are entitled to legal and equitable relief against Volkswagen, including damages, specific performance, attorney fees, costs of suit, and other relief as appropriate.

233.    Resorting to any informal dispute settlement procedure and/or affording Volkswagen an opportunity to cure these breaches of warranties is unnecessary and/or futile.  Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Volkswagen cannot remedy the problems associated with the Defective Vehicles without significantly reducing the effectiveness of the Defective Vehicles, and, as such, permanently causing financial harm to the Plaintiffs.   Any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiffs resort to an informal dispute resolution procedure and/or afford Volkswagen a reasonable opportunity to cure its breach of warranties is redundant and excused and thereby deemed satisfied.

**COUNT VII**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code §17200, *et seq.*)**

**(On Behalf of All Plaintiffs and the Nationwide Class or, alternatively, the California Plaintiffs and California Subclass Against All Defendants)**

234.   Plaintiffs incorporate all allegations made herein.

235.   The Unfair Competition Law (the "UCL") defines unfair business competition to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code §17200.

236.   The UCL also provides for injunctive relief, restitution, and disgorgement of profits for violations.

237.   Volkswagen's unlawful, unfair, and fraudulent business acts and practices are described throughout this Complaint and include, but are not limited to, knowingly and voluntarily concealing from Plaintiffs and the Class Members that the Defective Vehicles suffer from a design defect and intentionally using a defeat device in the Defective Vehicles to pass emissions tests when in fact they could not pass such tests as designed.

238.   In addition to the above, Volkswagen's conduct violated the unlawful prong of the UCL as it violated Cal. Civ. Code §§1572-73, 1709, 1711, and 1770 and the common law. Furthermore, Volkswagen's practices violate the Clean Air Act, 42 U.S.C. §§7522(a)(1) and (a)(3)(B); 40 C.F.R. §§600.302-12(c)-(e) and 16 C.F.R. §259.2(a), as well as the CARB emissions standards set forth in 13 Cal. Code Regs. tit. 13, §2282. Plaintiffs reserve the right to allege other violations of law, which

1   constitute other unlawful business acts or practices.  Such conduct is ongoing and

2   continues to this date.

3

4       239.   Volkswagen's acts, omissions, misrepresentations, practices, and non-

5   disclosures alleged herein also constitute "unfair" business acts and practices within

6   the meaning of the UCL in that Volkswagen's conduct is substantially injurious to

7   consumers, offends public policy, and is immoral, unethical, oppressive, and

8

9   unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable

10  to such conduct.

11

12      240.   As stated herein, Plaintiffs allege violations of consumer protection,

13  unfair competition, and truth-in-advertising laws in California resulting in harm to

14  consumers.  Plaintiffs assert violations of public policy by Volkswagen engaging in

15

16  false and misleading advertising, unfair competition, and deceptive conduct towards

17  consumers.  This conduct constitutes violations of the unfair prong of the UCL.  There

18

19  were reasonably available alternatives to further Volkswagen's legitimate business

20  interests other than the conduct described herein.

21      241.   Plaintiffs and the Class Members have been damaged by said practices in

22

23  that they relied on Volkswagen's misrepresentations and omissions regarding the

24  Defective Vehicles when purchasing or leasing the vehicles.  Plaintiffs and the Class

25  Members would not have purchased or leased these vehicles at the prices they paid,

26

27  and/or would have purchased less expensive alternative vehicles that contained

28  properly functioning Clean Diesel engine systems.

242.   Pursuant to Cal. Bus. & Prof. Code §§17200 and 17203, Plaintiffs, on behalf of themselves and all others similarly situated, seek relief as prayed for below, including judgment and restitution against Volkswagen and an order requiring Volkswagen to immediately cease such acts of unlawful, unfair, and fraudulent business practices and requiring Volkswagen to engage in a corrective marketing campaign.

## COUNT VIII

## VIOLATION OF CALIFORNIA FALSE ADVERTISING LAWS
### (Cal. Bus. & Prof. Code §17500, *et seq.*)

**(On Behalf of All Plaintiffs and the Nationwide Class or, alternatively, the California Plaintiffs and California Subclass Against All Defendants)**

243.   Plaintiffs incorporate all allegations made herein.

244.   Volkswagen violated the California Business & Professions Code §17500, *et seq.*, by marketing and concealing from Plaintiffs and the other Class Members that the Defective Vehicles suffer from a design defect and marketing the Defective Vehicles as having functioning Clean Diesel engine systems that performed as advertised.

245.   The above-described false, misleading, and deceptive advertising Volkswagen disseminated deceived Plaintiffs and the Class and continues to have the likelihood to deceive.

246.   Volkswagen emphasized repeatedly that their Defective Vehicles were environmentally friendly and a comparable environmental choice to hybrid or electric

vehicles, while knowing that their Defective Vehicles produced emissions up to 40 times greater than the EPA's legal limit.  To meet the EPA standards, the Defective Vehicles could not meet the level of performance or efficiency advertised by Volkswagen.

247.   In making and disseminating the statements alleged herein, Volkswagen knew or should have known their advertisements were untrue and misleading in violation of Cal. Bus. & Prof. Code §17500, *et seq*.  Plaintiffs and Class Members based their decisions to purchase and/or lease their vehicles in substantial part on Volkswagen's misrepresentations and omitted material facts.  The revenues to Volkswagen attributable to products sold in those false and misleading advertisements amount to millions of dollars for their vehicles.  Plaintiffs and the Class were injured in fact and lost money or property as a result, both in terms of purchase price, diminution of value, and the differential higher cost of fuel and maintenance.

248.   Plaintiffs and the Class have been damaged by said practice and seek relief as prayed below.

**COUNT IX**

**VIOLATION OF THE CALIFORNIA**

**CONSUMER LEGAL REMEDIES ACT**

**(Cal. Civ. Code §1750, *et seq.*)**

**(On Behalf of All Plaintiffs and the Nationwide Class or, alternatively, the California Plaintiffs and California Subclass Against All Defendants)**

249.   Plaintiffs incorporate all allegations made herein.

250. The following definitions come within the meaning of the Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code §1750, *et seq.*):

a. The members of the Class, all of whom purchased and/or leased the Defective Vehicles manufactured and sold by Volkswagen are "[c]onsumer[s]" within the meaning of Cal. Civ. Code §1761(d);

b. Volkswagen is a "[p]erson" within the meaning of Cal. Civ. Code §1761(c);

c. Plaintiffs' and each and every Class members' purchase and/or lease of the Defective Vehicle constitute a "[t]ransaction" within the meaning of Cal. Civ. Code §1761(e); and

d. The Defective Vehicles are "[g]oods" within the meaning of Cal. Civ. Code §1761(a).

Volkswagen's acts and practices as discussed throughout this Complaint constitute "unfair or deceptive acts or practices" by Volkswagen that are unlawful, as enumerated in Cal. Civ. Code §1770(a).

251. Such misconduct materially affected the purchasing decisions of Plaintiffs and the members of the Class by Volkswagen's failure to disclose that the Defective Vehicles were equipped with defective Clean Diesel engine systems designed to cheat EPA emissions tests and falsify the attributes of the Defective Vehicles. Plaintiffs and the Class reasonably relied on Volkswagen's misstatements

and material omissions regarding the Defective Vehicles when purchasing or leasing the Defective Vehicles.

252. Plaintiffs seek restitution and injunctive relief pursuant to Cal. Civ. Code §1780.

253. On or about September 24, 2015, Plaintiffs notified Volkswagen of the unlawful acts and practices described above by written notice, which contained a demand that Volkswagen pay damages in the amount of the reimbursement cost for Plaintiff and all other purchasers of the purchase price of the Defective Vehicles.

254. Pursuant to Cal. Civ. Code §1782(b), Volkswagen has been noticed because Plaintiffs sent a notice letter by certified mail, return receipt requested. Plaintiffs' letter advised Volkswagen that they have violated the CLRA and must correct and otherwise rectify the Defective Vehicles alleged to be in violation of Cal. Civ. Code §1770. Volkswagen was further advised that, in the event the relief requested has not been provided within thirty (30) days, Plaintiffs will amend this complaint to seek monetary damages pursuant to the CLRA. Volkswagen's conduct is malicious, fraudulent, and wanton and provided false information about its emissions and decreased performance without the fraudulent defeat device that was contained in the Defective Vehicles' software.

255. As a result of the Cal. Civ. Code §1770 violations described above, Plaintiffs and each and every member of the Class have suffered actual damages. Plaintiffs have lost money or property by purchasing or leasing the Defective Vehicles

they otherwise would not have, or paying a premium they otherwise would not have, and the Defective Vehicles have suffered a diminution in value, and any fix would result in increased fuel and efficiency costs, and decreased performance.

256.   Attached as **Exhibit 1** are the California Plaintiffs' declarations that demonstrate that venue is proper in this District, pursuant to Cal. Civ. Code §1780(d).

257.   Plaintiffs seek actual damages, restitution, and attorneys' fees and costs pursuant to Cal. Civ. Code §1780.  Furthermore, Volkswagen acted with oppression, fraud, and/or malice in engaging in the Cal. Civ. Code §1770 violations described above.  As a result, Plaintiffs are entitled to punitive damages pursuant to Cal. Civ. Code §1780.

**COUNT X**

**VIOLATION OF THE CALIFORNIA SONG-BEVERLY WARRANTY ACT AND BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(Cal. Civ. Code §§1791.1 and 1793.2(d), *et seq.*)**

**(On Behalf of the California Plaintiffs and the California Subclass Against All Defendants)**

258.   The California Plaintiffs on behalf of themselves and the California Subclass, reallege as if fully set forth herein, each and every allegation set forth above.

259.   The California Plaintiffs and California Subclass members who purchased the Defective Vehicles in California are "[b]uyer[s]" within the meaning of Cal. Civ. Code §1791(b).

260.   The Defective Vehicles are "[c]onsumer goods" within the meaning of Cal. Civ. Code §1791(a).

261.   Volkswagen is a "[m]anufacturer" and/or "[d]istributor" of the Defective Vehicles within the meaning of Cal. Civ. Code §§1791(e) and (j).

262.   Volkswagen made implied warranties to the California Plaintiffs and the members of the California Subclass within the meaning of Cal. Civ. Code §1791.1(a).

263.   Volkswagen impliedly warranted to the California Plaintiffs and the California Subclass members who purchased and/or leased the Defective Vehicles that the Defective Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§1791.1(a) and 1792.

264.   The Defective Vehicles are not merchantable as they do not meet emission regulations and cannot be legally sold in their present state.

265.   The Defective Vehicles are not of the quality that a buyer would expect and are not merchantable.  Because the Defective Vehicles are not merchantable, Volkswagen breached the implied warranty of merchantability within the meaning of Cal. Civ. Code §§1791.1(b) and 1792.1.

266.   As a proximate result of Volkswagen's breach of the implied warranty of merchantability, the California Plaintiffs and the California Subclass members sustained damages.  Pursuant to Cal. Civ. Code §§179l.l(d), 1794(a), and 1794(b)(2), the California Plaintiffs and the California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase/lease price

of the Defective Vehicles or any diminution in value.  The California Plaintiffs and the California Subclass members are also entitled to costs and attorneys' fees pursuant to Cal. Civ. Code §1794.

**COUNT XI**

**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT**

**(Colo. Rev. Stat. §6-1-101, *et seq.*)**

**(On Behalf of the Colorado Plaintiff and Colorado Subclass Against All Defendants)**

267.   The Colorado Plaintiff and the Colorado Subclass, reallege as if fully set forth herein, each and every allegation set forth above.

268.   Volkswagen's actions alleged herein were carried out in the course of their primary business described above.

269.   The Defective Vehicles are "goods" or "merchandise" as defined in Colo. Rev. Stat. §6-1-105(1).

270.   Volkswagen's actions described above constitute deceptive trade practices in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. §6-1-105(1), in that they issued untrue and misleading statements relating to the characteristics, qualities, standard, and performance of Volkswagen Defective Vehicles. More specifically, Volkswagen represented that the Defective Vehicles were environmentally friendly and produced legal levels of emissions, all while maintaining excellent gas mileage and high quality performance.  These representations were materially false.

271.   The deceptive practices and false advertising regarding the Defective Vehicles' EPA compliance and environmental safety induced the Colorado Plaintiff and the Colorado Subclass to purchase and/or lease Volkswagen's Defective Vehicles and pay a higher price for the Defective Vehicles, and have the tendency to attract consumers for this purpose.  These deceptive statements were material to the Colorado Plaintiff and Colorado Subclass members and significantly impact the public, who are actual or potential consumers.

272.   Upon information and belief, Volkswagen's deceptive practices have been executed knowingly, willfully, and deliberately.

273.   As a direct and proximate result of Volkswagen's actions described above, the Colorado Plaintiff and Colorado Subclass members have been injured in fact and suffered damages, and seek relief pursuant to Colo. Rev. Stat. §6-1-113(2)(a) and reasonable attorneys' fees pursuant to Colo. Rev. Stat. §6-1-113(2)-(3).

**COUNT XII**

**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

**(815 Ill. Comp. Stat. 505/1, *et seq*. and 720 Ill. Comp. Stat. 295/1A)**

**(On Behalf of the Illinois Plaintiff and Illinois Subclass Against All Defendants)**

274.   The Illinois Plaintiff and the Illinois Subclass, reallege as if fully set forth herein, each and every allegation set forth above.

275.   Volkswagen is a "person" as defined in 815 Ill. Comp. Stat. 505/1(c).

276.   Illinois Plaintiff and the Illinois Subclass are "consumers" as defined in 815 Ill. Comp. Stat. 505/1(e).

277.   Volkswagen's actions described above constitute deceptive trade practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, which prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."  815 Ill. Comp. Stat. 505/2.

278.   The deceptive practices and false advertising regarding the Defective Vehicles' EPA compliance and environmental safety induced the Illinois Plaintiff and the Illinois Subclass to purchase and/or lease Volkswagen's Defective Vehicles and pay a higher price for the Defective Vehicles, and have the tendency to attract consumers for this purpose.  These deceptive statements were material to the Illinois Plaintiff and Illinois Subclass members and significantly impact the public, who are actual or potential consumers.

279.   Volkswagen represented to the Illinois Plaintiff and the Illinois Subclass that the Defective Vehicles were environmentally friendly and produced legal levels of emissions, all while maintaining excellent gas mileage and high quality performance.  These representations were materially false.

280.   Volkswagen has known of its use of the defeat device and the true nature of its Defective Vehicles' emission systems for at least six years, but concealed all of that information until compelled by the EPA.

281.   The Illinois Plaintiff and the Illinois Subclass relied on Volkswagen's fraudulent misrepresentations and omissions regarding the Vehicles' fuel efficiency in purchasing and/or leasing their Vehicles.

282.   The Illinois Plaintiff and the Illinois Subclass have suffered direct, indirect, incidental, and consequential damages as a proximate result of Volkswagen's wrongful conduct.

283.   Volkswagen had an ongoing duty to all customers to refrain from unfair and deceptive acts or practices under the Illinois Consumer Fraud and Deceptive Business Practices Act.  This duty was breached to Illinois Plaintiffs and the Illinois Subclass.

284.   Volkswagen's violations present a continuing risk to Illinois Plaintiff as well as to the general public.  Volkswagen's unlawful acts and practices complained of herein affect the public interest.

285.   Pursuant to 815 Ill. Comp. Stat. 505/10a(a), Illinois Plaintiff and the Illinois Subclass seeks monetary relief against Volkswagen in the amount of actual damages, as well as punitive damages because Volkswagen acted with fraudulent intent and/or malice and/or was grossly negligent.

286.   Illinois Plaintiff and the Illinois Subclass also seeks an order enjoining Volkswagen's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. 505/1, *et seq.*

## COUNT XIII
## VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT
### (N.M. Stat. Ann. §57-12-1, *et seq.*)
### (On Behalf of the New Mexico Plaintiff and the New Mexico Subclass Against All Defendants)

287.   The New Mexico Plaintiff and the New Mexico Subclass, reallege as if fully set forth herein, each and every allegation set forth above.

288.   Volkswagen's actions alleged herein were carried out in the course of their primary business described above.

289.   The acts of Volkswagen, as alleged throughout this Complaint were performed in the course of Volkswagen's trade or business and thus occurred in or affected "trade" or "commerce" as defined in N.M. Stat. Ann. §57-12-2(C).

290.   Volkswagen is a "person" as defined by N.M. Stat. Ann. §57-12-2(A).

291.   Volkswagen violated N.M. Stat. Ann. §57-12-3 by representing that the Defective Vehicles were environmentally friendly and produced legal levels of emissions, all while maintaining excellent gas mileage and high quality performance. These representations were materially false.

292.   Volkswagen knew or should have known that their fraudulent scheme would induce New Mexico Plaintiff and the New Mexico Subclass into purchasing the Defective Vehicles at a premium price, or purchasing the Defective Vehicles when they otherwise would not have.

293.   The New Mexico Plaintiff who represents the New Mexico Subclass has been injured by the acts of Volkswagen, as alleged throughout this Complaint.  The New Mexico Plaintiff has lost money or property by purchasing the Defective Vehicles they otherwise would not have, or paying a premium they otherwise would not have, and the Defective Vehicles have suffered a diminution in value.

294.   Pursuant to N.M. Stat. §57-12-10(B), judgment shall be for treble the amount fixed by the verdict.

295.   Pursuant to N.M. Stat. §57-12-10(C), a reasonable attorney fee should be allowed as part of the court costs.

**COUNT XIV**

**VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE PRACTICE ACT**

**(N.C. Gen. Stat. §75-1.1, *et seq.*)**

**(On Behalf of the North Carolina Plaintiff and North Carolina Subclass Against All Defendants)**

296.   The North Carolina Plaintiff and North Carolina Subclass, reallege as if fully set forth herein, each and every allegation set forth above.

297. This cause of action is brought under North Carolina's Unfair Trade Practice Act, N.C. Gen. Stat. §75-1.1, *et seq*.

298. The acts of Volkswagen, as alleged throughout this Complaint were performed in the course of Volkswagen's trade or business and thus occurred in or affected "commerce" as defined in N.C. Gen. Stat. §75-1.1(b).

299. The acts of Volkswagen, as alleged throughout this Complaint, constitute unfair or deceptive acts or practices in or affecting commerce. These acts were undertaken willfully and Volkswagen has partially claimed responsibility for them, but not resolved any problems. These acts at issue had a capacity or tendency to deceive or created a likelihood of deception. More specifically, Volkswagen represented that the Defective Vehicles were environmentally friendly and produced legal levels of emissions, all while maintaining excellent gas mileage and high quality performance. These representations were materially false, and induced the North Carolina Plaintiff and members of the North Carolina Subclass into purchasing or leasing Defective Vehicles.

300. The North Carolina Plaintiff who represents the North Carolina Subclass has been injured by the acts of Volkswagen, as alleged throughout this complaint. The North Carolina Plaintiff has lost money or property by purchasing the Defective Vehicles they otherwise would not have, or paying a premium they otherwise would not have, and the Defective Vehicles have suffered a diminution in value.

301.   Pursuant to N.C. Gen. Stat. §75-16, judgment shall be for treble the amount fixed by the verdict.

302.   Pursuant to N.C. Gen. Stat. §75-16.1, a reasonable attorney fee should be allowed as part of the court costs.

## COUNT XV

## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (73 Pa. Cons. Stat. §201-1, *et seq.*)

### (On Behalf of the Pennsylvania Plaintiff and Pennsylvania Subclass Against All Defendants)

303.   The Pennsylvania Plaintiff and the Pennsylvania Subclass, reallege as if fully set forth herein, each and every allegation set forth above.

304.   Volkswagen is a "person" as defined by 73 Pa. Cons. Stat. §201-2.

305.   Volkswagen offered the Defective Vehicles for sale in trade or commerce as defined by 73 Pa. Cons. Stat. §201-3.

306.   As set forth above, Volkswagen engaged in fraudulent conduct by marketing and concealing from Pennsylvania Plaintiffs and the Pennsylvania Subclass that the Vehicles suffer from a design defect and marketing the Defective Vehicles as having functioning Clean Diesel engine systems.

307.   Volkswagen's conduct constitutes unfair methods of competition and unfair or deceptive acts or practices as defined by 73 Pa. Cons. Stat. §201-2(4)(vii), (ix), (xiv), and (xxi).

308.   Volkswagen represented to the Pennsylvania Plaintiff and the Pennsylvania Subclass that the Defective Vehicles were environmentally friendly and produced legal levels of emissions, all while maintaining excellent gas mileage and high quality performance. These representations were materially false.

309.   The Pennsylvania Plaintiff and the Pennsylvania Subclass relied on Volkswagen's fraudulent misrepresentations and omissions regarding the Vehicles' fuel efficiency in purchasing and/or leasing their Vehicles.

310.   The Pennsylvania Plaintiff and the Pennsylvania Subclass have suffered direct, indirect, incidental, and consequential damages as a proximate result of Volkswagen's wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and State Subclasses, respectfully request that the Court enter judgment in their favor and against Volkswagen, as follows:

(A)   Certification of the proposed Nationwide Class and/or State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

(B)   An order permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

(C)   Injunctive relief in the form of a recall and reimbursement of Defective Vehicle purchases;

1        (D)    Costs, restitution, damages, including treble and/or punitive damages,

2    and disgorgement in an amount to be determined at trial;

3

4        (E)    Pre- and post-judgment interest on any amounts award;

5        (F)    An award of costs and attorneys' fees; and

6

7        (G)    Such other or further relief as may be appropriate.

8    **DEMAND FOR JURY TRIAL**

9        Plaintiffs hereby demand a jury trial for all claims so triable.

10   DATED:  September 28, 2015

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
RACHEL L. JENSEN

_____
s/ Rachel L. Jensen
RACHEL L. JENSEN

655 W. Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON
MARK DEARMAN
ALEX KRUZYK
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

BERNARD M. GROSS, P.C.
DEBORAH R. GROSS
100 Penn Square East, Suite 450
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)
debbie@bernardmgross.com

SOUTHERN CALIFORNIA LEGAL
  CENTER, INC.
STUART FURMAN
9150 Vista Aleta

- 86 -

1

2

Valley Center, CA  92082
Telephone:  877-820-3335
760/749-2926 (fax)
sfurman@socallegalcenter.com

3

4

GREENWALD DAVIDSON RADBIL
  PLLC
AARON D. RADBIL
106 East Sixth Street, Suite 913
Austin, TX  78701
Telephone:  512/322-3912
561/961-5684 (fax)
aradbil@gdrlawfirm.com

5

6

7

8

9

GREENWALD DAVIDSON RADBIL
  PLLC
MICHAEL L. GREENWALD
5550 Glades Road, Suite 500
Boca Raton, FL  33431
Telephone:  561/826-5477
561/961-5684 (fax)
mgreenwald@gdrlawfirm.com

10

11

12

Attorneys for Plaintiffs

13

I:\Admin\CptDraft\Consumer\Cpt VW_Consumer.doc

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28